**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **PATRICK JOHN,** | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. **23-310-PJM** |
| **ESSENTIA INSURANCE COMPANY,** | * | |
| Defendant. | * | |

\*\*\*

**MEMORANDUM OPINION**

In this insurance contract dispute, Patrick John claims that Essentia Insurance Company breached John's "Expert Collector" policy with it by failing to pay him on his claim of loss for the reported theft of two vintage Porsche coupe automobiles. Essentia has filed a Motion for Summary Judgment (ECF No. 105), and John has filed a Motion for Partial Summary Judgment (ECF No. 102). The Motions are fully briefed. *See* ECF Nos. 110, 113, 117, 118. No hearing is necessary. *See* D. Md. Local R. 105.6. For the following reasons, the Court **GRANTS** Essentia's Motion for Summary Judgment (ECF No. 105) and **DENIES AS MOOT** John's Motion for Partial Summary Judgment (ECF No. 102).

**I.**

John is a resident of Fort Washington, Maryland. ECF No. 32 ¶ 1; *see* ECF No. 105-2 at 2.[1] Essentia is an insurance company organized under the laws of Missouri, registered to conduct business in Maryland. *See* ECF No. 32 ¶ 2.

---

[1] Unless otherwise noted, all citations to specific pages correlate to the page numbers assigned by the Court's CM/ECF system.

**A.**

On May 13, 2019, John applied for an insurance policy to protect against damage or loss to a red 1992 Porsche 911 Turbo coupe.[2] *See* ECF No. 105-3 at 3, 6. In completing the insurance application, John certified that the vehicle was, in his words, "owned (i.e., titled or registered)" by him and in his name. *Id.* at 5. Several months later, John sought coverage from Essentia for another Porsche 911 coupe, this one black in color and made in 1987. *See* ECF No. 102-1 at 4; ECF No. 105-29 at 6-7. Eventually, John was issued an Expert Collector policy by Essentia to cover both vehicles in the total amount of $543,000.[3] *See* ECF No. 102-2 at 7; ECF No. 105-2 at 4. Of that total, $229,000 covered the 1987 Porsche, and $314,000 covered the 1992 Porsche, consistent with their appraised values. *See* ECF No. 102-1 at 8.

At the time Essentia issued the policy, John had provided the insurer with copies of the titles for the cars,[4] but neither were in his name. Instead, both titles were "still in the name of the Florida and California sellers" from whom John claimed to have purchased the vehicles. ECF No. 102-1 at 6. In agreeing to provide coverage for the two Porsches, the policy imposed on John certain obligations in the event of any claimed loss, including the obligation to produce records relevant to the insurer's investigation of any claim, and the requirement that John submit to examinations under oath to aid the insurer in its investigation. *See* ECF No. 105-2 at 11-12. Further specifics of these provisions will be discussed in more detail *infra*. The policy went into effect on August 6, 2019. *See* ECF No. 102-2 at 7.

---

[2] John's initial application was made to Hagerty Insurance Agency, LLC for a policy to be underwritten by Nationwide. *See* ECF No. 105-3 at 2. The policy that John received was underwritten by Essentia. For purposes of this dispute, all agree that John and Essentia are the real parties in interest.

[3] In addition to the Expert Collector policy, John obtained a "Classic Automobile" liability policy. *See* ECF No. 118-1 at 2 (Classic Automobile); ECF No. 118-2 at 2 (Expert Collector); *see also* ECF No. 105-2 at 2 (the premium for the Classic Automobile policy was $268); *id.* at 4 (the premium for the Expert Collector policy was $8,295).

[4] These "copies" were photographs of what appear to be the titles to the cars taken in connection with appraisals that John obtained in April 2019. *See* ECF No. 105-24 at 20; ECF No. 102-6 at HAGERTY/ESSENTIA 0041, 0061.

In early January 2020, John and a friend apparently left Maryland for a weekend ski trip. *See* ECF No. 102-1 at 8. When he returned, John says, he discovered that the two Porsches were missing from his garage; they had presumably been stolen. *See id.* The next day, John reported the loss to the police and to Essentia, and eventually filed a claim with Essentia. *Id.* The cars have never been recovered, and no one has ever been arrested in connection with the alleged theft. *See* ECF No. 105-1 at 10; ECF No. 110-1 at 7; ECF No. 105-25 at 34; ECF No. 110-8 at ESSENTIA 5446.

Essentia immediately launched an investigation into the loss.[5] *See* ECF No. 105-1 at 10. Almost as soon as the investigation began, Essentia came upon information that, in its view, called into question the veracity of John's claim.

To begin, as indicated, in his first recorded statement on January 8, 2020, John averred that both cars were titled in his name at the time of the loss. *See* ECF No. 105-5 at 4; ECF No. 110-5 at ESSENTIA 0260. But when asked if there was "anybody else's name on [the titles]," John responded, "our company," *viz.*, Titan BRB, Inc., which John claimed he owned together with one Adrienne Milan.[6] *See* ECF No. 105-5 at 4-5. This explanation appeared to conflict with representations John had made in his insurance application, where he listed only himself as an owner (and operator) of the vehicles. *See* ECF No. 102-7 at ESSENTIA 0002. John also told Essentia's investigator that he found the cars "through eBay," after which he supposedly

---

[5] As an insurance company, Essentia is no stranger to fraud schemes related to policies covering high-value automobiles. Indeed, the Court takes judicial notice of the fact that the industry has terms of art, "vehicle dumping" or "give-up" claims, to describe false reports of stolen vehicles which pay out "in two ways: (1) through an insurance settlement to replace the stolen vehicle, and (2) through the sale of the original car." *Five Types of Car Insurance Fraud*, Allstate, https://www.allstate.com/resources/car-insurance/types-of-car-insurance-fraud (last visited June 5, 2024). That John reported his Porsches stolen approximately six months after obtaining a policy providing half-a-million dollars of coverage would have understandably stirred the insurer's concern.

[6] As indicated in the Court's Memorandum Opinion of December 28, 2023, Milan appears to have used variations of the spelling of both his first and last names over the years. *Compare* ECF No. 105-22 (Adrienne Milan) *with* ECF No. 38-2 1 n.1 (Adrian Milam, etc.). This Opinion refers to him simply as "Milan," consistent with John's operative Complaint. *See* ECF No. 32.

"contacted the owner and stuff like that and, and, and, basically made the purchase." ECF No. 105-5 at 7. When asked how much he paid for the vehicles, John stated that he did not "have the exact figures" but confirmed that they cost approximately "$150,000 apiece." *Id.* He conceded that, as of the time of the claimed loss, he had not registered either Porsche with the Maryland Department of Transportation Motor Vehicle Administration "because they were just collector's cars, so they were in my garage, just garage kept as a, you know, for a collection." *Id.* at 4. This explanation, however, appeared to be at odds with John's representations in his application for the policy, where he indicated that he intended to drive the red 1992 Porsche for pleasure approximately 3,000 miles per year. *See* ECF No. 105-3 at 3; ECF No. 102-7 at ESSENTIA 0002.

On January 16, 2020, John sent an "Affidavit of Theft" to Essentia's investigator, in which he claimed that the purchase price for the 1987 Porsche was "$90k/80k," ECF No. 105-7 at 3, which, to remind, had been insured at a value of $229,000, ECF No. 102-1 at 8, consistent with the value listed in the appraisal that John submitted in support of his application for insurance. *See* ECF No. 105-24 at 5. John's affidavit also indicated that the title to the 1987 Porsche had been issued by the State of Florida, not Maryland where John lived, and further indicated that John was employed by Titan BRB. *See* ECF No. 105-23 at 2.

Essentia continued its investigation by, among other things, requesting documents from John that would shed light on a number of issues, including his actual ownership of the vehicles, the value of the loss, and John's financial status insofar as it might reflect his ability to consummate the purchase of two luxury vehicles for tens of thousands of dollars. *See* ECF No. 105-1 at 11-12. The requests also sought copies of communications between John and Milan, who John had belatedly identified as sharing an ownership interest in the vehicles; documents such as bills of sale that would reflect when, where, and with whom the sales transactions for the vehicles had been consummated; and financial documents from John's accountant which would, in theory

4

at least, speak to John's financial wherewithal to purchase the vehicles in the first place. *See id.*; *see, e.g.*, ECF Nos. 105-10, 105-30 to 105-37 (formal document requests dated from March 5, 2020 to April 16, 2021).

The parties dispute whether John satisfactorily complied with Essentia's document requests, but it is undisputed that he did not provide at least some of the requested records. For instance, while John initially agreed to have his accountant in North Carolina produce certain financial documents, the accountant ultimately did not do so, despite Essentia's attempts to obtain those documents, including by sending a courier to the accountant's office in North Carolina. *See id.* at 12-13; ECF No. 110-1 at 9-10. John has never provided copies of the original bills of sale. *See* ECF No. 110-1 at 7-8; ECF No. 110-4 at 176:15-177:15.

In October 2020, after receiving what it believed to be insufficient responses to its document requests, Essentia took John's first examination under oath. *See* ECF No. 105-1 at 13; *see, e.g.*, ECF No. 110-9 (October 29, 2020 Examination Under Oath); ECF No. 105-9 (same). Over the course of the next year, Essentia would reconvene John's examination under oath six more times—by the end of the investigation, the seven examinations lasted more than twenty hours. *See* ECF No. 110-1 at 2. As will be discussed, the parties quarrel over whether questioning this extensive was warranted and whether the responses John gave during its examinations were sufficient to allay Essentia's concerns with his claim. *See* ECF No. 118 at 12; ECF No. 110-1 at 5-6.

But by the end of its investigation, Essentia had learned additional details about the purchases of both Porsches that it believed cast serious doubt on John's claim. Both cars, it turned out, had been located and their purchases had been handled by Milan, not by John, as he initially represented. *See* ECF No. 102-1 at 3-4. One car was claimed to have been delivered to Milan's home in Maryland, and the other was picked up by Milan at a near-by Walmart parking lot. *See*

ECF No. 102-4 at 212:14-215:21. Only thereafter were the cars delivered to John's home. *See id.*

at 215:16-216:14. John was unable to produce any records indicating that he personally paid for

the cars; instead, evidence developed by Essentia suggested that the cars had been purchased

through wire transfers from an account held by Titan BRB. *See* ECF No. 102-3 at 55:07-19; ECF

No. 105-12 at 178:12-179:18. John eventually claimed, and to date continues to claim, that Milan

in fact purchased the cars on John's behalf through the Titan BRB bank account and that this was

done to compensate John for services that John had purportedly rendered on behalf of Titan BRB.

*See* ECF No. 102-1 at 4; ECF No. 102-3 at 55:7-19.[7]

Titan BRB's role in this stream of events raised further questions as to the basis of John's

claim. The company was incorporated with Milan as the sole shareholder, but John claimed to

have access to the company bank account from which the purchase funds were apparently wired.

*See* ECF No. 102-3 at 43:01-45:17; ECF No. 102-4 at 48:05-16. Although both John and Milan

professed to be "business partners," they could not produce, nor in fact did they apparently ever

have, a written partnership agreement. *See* ECF No. 102-3 at 189:03-19 ("I said as far as a

business I said on paper we are not business partners, but to me really, he is a partner for me.");

---

[7] Portions of Milan's deposition testimony submitted by John in support of his Motion are consistent with John's retelling of the transaction. *See* ECF No. 102-4 at 42:14-17, 47:15-16 ("[T]he car was purchased with our company, you know, Titan BRB. So it was part of that company, so that's where the car was purchased from there, from our mutual partnership company it was purchased. . . . [M]oney was owed to [John]. There was a deal that he closed that ran through our company, BRB, Inc. . . . And that was his job. So he was owed money."). On the other hand, other portions of Milan's testimony appear to contradict this story. *See* ECF No. 102-4 at 26:05-22 ("I think it was the black one that I *gave* to [John]. The reason I *gave* it to him because it didn't—it didn't—it was primo. . . . And then the red one, you know, which is the one that *he bought from me*, as well. . . . [I]t had a history to it. It wasn't damaged, but it was stolen. . . . I guess, it was stolen back in the '80s or '90s. ∴. . And the history behind it, *that's why I sold it to Patrick [John]*, because of the history." (Emphases added)); *see also id.* at 36:15-37:04 (Q: "[Y]ou're thinking about making that decision to buy [a vehicle], you don't necessarily have to run it by Patrick [John] first to get his blessing before you buy it?" A: "No. No. I just kept him in the loop. Like, we're just in touch with each other, you know, just—you know, we're boys. You know, and we're business people and are business partners and I just real close, you know."). These "internal inconsistenc[ies]" in Milan's testimony on this point most assuredly fail to move the needle, even when viewing the facts in the light most favorable to John. *Bailey v. S.C. Dep't of Soc. Servs.*, 851 F. Supp. 219, 221 (D.S.C. 1993).

Just in passing: Trafficking in a stolen vehicle? Could Essentia have been any more alerted to potential problems with the true ownership of the vehicle?

*see id.* at 187:06-22.[8]  Nor did John or Milan maintain a recordkeeping system from which an

outside observer could determine how much money in the Titan BRB bank account belonged to

whom or when specific amounts in the account were supposed to have been allocated to John. *See*

ECF No. 105-14 at 41:10-43:22; ECF No. 105-9 at 188:10-189:25.

Indeed, aside from their own say-so, neither John nor Milan ever produced documents or

other evidence to corroborate their Porsches-for-services-rendered theory, such as IRS Forms W-2

or 1099 issued by Titan BRB, which would reflect that the cars represented some sort of in-kind

compensation to John.  Nor, apparently, did John ever report receiving the cars as income to the

tax authorities—as it happens, John concedes that he did not file tax returns in either 2019 (when

the cars were purchased), nor in 2020 (when the cars were stolen), nor apparently in 2021, when

he might have been expected to claim a property loss. *See* ECF No. 105-12 at 124:05-125:05.

Finally, it is clear that Titan BRB, not John, paid the premiums on the Expert Collector policy.

*See* ECF No. 102-10 at HCCW 0125; ECF No. 105-20 at 4-5.

On January 12, 2022, Essentia sent John a letter advising him that it had denied his claim.

*See* ECF No. 102-12 at 1; ECF No. 105-20 at 1.  Essentia's first asserted reason for denial was that

John had violated the "Fraud" provision of the policy by misrepresenting material facts during the

investigation of his claim. *See, e.g.*, ECF No. 102-12 at 1.  The letter set forth various examples of

what Essentia believed to be material misrepresentations, including: John's affirmance in his

application that the cars were "owned (i.e., titled or registered)" by him or in his name;  his

reaffirmation during his initial recorded statement that both cars were titled to him and that he was

the individual who had located the vehicles, negotiated their purchase, and otherwise conducted

the purchase transactions; and John's production of "false, handwritten" bills of sale that did "not

---

[8] John and Milan also claimed to operate business entities other than Titan BRB, using derivations of the name "Titan," some being limited liability companies and others being corporations. *See* ECF No. 102-4 at 48:10-15, ECF No. 102-3 at 26:04-22.

accurately reflect the sale transactions relating to either Porsche." *Id.* at 2. Essentia also based its denial on its determination that John did not have an insurable interest in the vehicles. *See id.* at 1.

**B.**

On September 19, 2022, John sued Essentia in the Circuit Court for Prince George's County. *See* ECF No. 1-2. His Complaint consisted of two counts: one for breach of contract, and the other for a declaratory judgment. *See id.* at 6.

Essentia thereafter removed the case to this Court. *See* ECF No. 1. John filed a Motion to Remand to State Court, which the Court by Memorandum Opinion and Order dated March 28, 2023, denied. *See* ECF Nos. 12, 13. The case then proceeded to discovery. *See* ECF No. 18.

On October 5, 2023, with leave of the Court, John filed his currently operative Complaint (the Second Amended Complaint). *See* ECF No. 32. That Complaint specifies that, in John's view, Essentia breached his "Expert Collector" policy by denying his claim. *See id.* ¶¶ 3, 19-20.[9] To remedy what he sees as Essentia's wrongful denial of his claim, John has requested judgment in the total amount of $554,860 plus prejudgment interest, as well as a declaration that he is the owner of the vehicles. He also asserts that that Essentia's suspicions of fraud are unwarranted, and that the insurer must pay his claim. *See id.* at 6-7.

In response, Essentia filed a Motion to Dismiss John's Complaint for failure to state a claim. *See* ECF No. 38. By Memorandum Opinion and Order dated December 28, 2023, the Court granted in part and denied in part Essentia's Motion, dismissing John's declaratory-judgment count but allowing his breach-of-contract count to proceed. *See* ECF Nos. 55, 56.

A flurry of discovery motions ensued, ECF Nos. 44, 52, 54, 60, 63, 67, all of which were resolved by the Court in a recorded telephone conference on February 27, 2024. ECF No. 91.

---

[9] The Expert Collector policy is formally referred to as "Expert Collector" Valuable Collections Policy No. 7P75487C, with effective dates from August 6, 2019 through August 6, 2020. *See* ECF No. 32 ¶ 3; ECF No. 105-2 at 4.

After discovery closed, the parties filed their respective summary judgment motions. *See* ECF Nos. 102, 105.

The matter is now ripe for decision on those Motions.

## II.

A court may grant summary judgment to a moving party that shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of establishing the absence of any genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Although a court must draw all reasonable inferences and construe ambiguities in favor of the nonmoving party, *see, e.g., United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), a nonmoving party may not rest on mere allegations in the pleadings or conclusory denials of fact to create a genuine dispute of material fact. *See Celotex*, 477 U.S. at 324; *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). A fact is material only if it is one that "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. If sufficient evidence exists for a reasonable finder of fact to render a verdict in favor of the nonmoving party, summary judgment should be denied. *See id.*

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). "When considering each individual motion, the court must take care to resolve all

factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.* (internal quotation marks omitted).

### III.

Essentia seeks summary judgment because, it maintains, John's "breach-of-contract claim is barred by the nonoccurrence of a condition precedent." ECF No. 105-1 at 16.[10]  Specifically, Essentia claims that its obligation to pay John was never triggered because he failed to satisfy his obligations under the Expert Collector policy before filing suit, which is to say the requirements that he provide all the documents the insurer requested during its investigation, that he give truthful and complete answers during his examinations under oath, and that he not misrepresent material facts. *See id.*

John does not dispute that his policy contains a condition precedent to this effect, but contests Essentia's characterization of his conduct as noncooperation. *See* ECF No. 110-1 at 10-15; ECF No. 118 at 2.[11]

Is John's claim barred by a condition precedent imposing an obligation of cooperation that he failed to comply with?

---

[10] Although raised in its denial letter and alleged in its Answer, Essentia does not seek summary judgment on its contention that John lacked an insurable interest in the vehicles. *See* ECF No. 105-1 at 15 n.6.

[11] John additionally challenges the propriety of Essentia's noncooperation defense on the theory that the insurer should be estopped from litigating that defense because it did not identify noncooperation as a basis for denial of his claim in its denial letter. *See* ECF No. 110-1 at 2, ECF No. 102-1 at 8-9, 17-22. John's argument is easily answered. "One asserting the benefit of an estoppel must have been misled to his injury and have changed his position for the worse, having believed and relied on the representations of the party sought to be estopped." *Rubinstein v. Jefferson Nat'l Life Ins. Co.*, 268 Md. 388, 393 (1973). There is simply no evidence here which permits the application of the doctrine of estoppel. In fact, the evidence that John *has* produced shows that he was fully aware during the investigation that Essentia would to a virtual certainty cite his noncooperation as a ground for denying his claim. *See* ECF No. 102-10 at HCCW 0273. Essentia also explicitly "reserve[d] its rights to assert any and all additional grounds for denial, [or] defenses . . . which may become known to Essentia in the future." ECF No. 102-12 at 5; ECF No. 105-20 at 5.

**A.**

Under Maryland law, which governs the Expert Collector policy, *see* ECF No. 55 at 6 n.3, a breach-of-contract claim must establish the existence of a contractual obligation, a breach of that obligation, and any resulting damage. *See RRC Ne., LLC v. BAA Md., Inc.*, 413 Md. 638, 658 (2010). Integral to the law of contracts is the principle that a party's obligation to perform one or more aspects of a contract will not begin if the circumstances that trigger such an obligation do not exist. *See Sherwood Brands, Inc. v. Great Am. Ins. Co.*, 418 Md. 300, 330 (2011). This is known as a "condition precedent," the non-occurrence of which "does not constitute a breach," but which "merely relieves the other party from performing under the contract/policy." *Id.* In the context of insurance policies, a condition precedent is typically a requirement that must be performed by the insured "before any obligation on the part of the assurer commences." *Woznicki v. GEICO Gen. Ins. Co.*, 443 Md. 93, 127 (2015).

In determining whether a contract contains a condition precedent, Maryland courts apply the "objective interpretation of contracts" approach, meaning that courts will "give effect to the plain meaning of an unambiguous term, and will evaluate a specific provision in light of the language of the entire contract." *Weichert Co. of Md. v. Faust*, 419 Md. 306, 324 (2011). "[W]hether a stipulation in a contract constitutes a condition precedent is one of construction dependent on the intent of the parties to be gathered from the words they have employed and, in case of ambiguity, after resort to the other permissible aids to interpretation." *Chirichella v. Erwin*, 270 Md. 178, 182 (1973). "Although no particular form of words is necessary in order to create an express condition, such words and phrases as 'if' and 'provided that,' are commonly used to indicate that performance has expressly been made conditional . . . as have the words 'when,' 'after,' 'as soon as,' or 'subject to[.]'" *Id.* (citations omitted).

11

Under the subheading "Legal Action Against Us" (the "No Action" Provision), the Expert Collector policy provides that: "No legal action may be brought against [Essentia] until there has been full compliance with all the terms of this policy." ECF No. 105-2 at 81. Such language unambiguously sets forth a condition precedent, since it conditions the insured's right to initiate legal proceedings on his or her "full compliance" with the terms of the policy. *See, e.g., Dolan v. Kemper Indep. Ins. Co.*, 237 Md. App. 610, 624-25 (2018) (holding that identical language "unquestionably creates a condition precedent").

The No Action Provision is not the only term of the policy containing a condition precedent, according to Essentia. *See* ECF No. 105-1 at 18-20. The individual terms setting forth John's obligations in the event of a loss amount to additional conditions precedent to Essentia's liability. *See id.* Those obligations, says Essentia, are contained within the "Duties After Loss" section (the "Duties" Provision), which reads in pertinent part:

> If you do not comply with these [following] general duties, no coverage will be provided: . . . (E) You must cooperate with us in the investigation, defense, or settlement of any loss; . . . (G) You must provide us with records and documents we request and permit us to make copies; . . . (H) You must agree to be examined under oath, if we request.

ECF No. 105-2 at 79-80.

As with the No Action Provision, the Duties Provision speaks in conditional terms, using the word "if" to "indicate that [Essentia's] performance has expressly been made conditional." *Chirichella*, 270 Md. at 182. The Duties Provision also makes clear that forfeiture of an insured's claim may result from noncompliance. *See* ECF No. 105-2 at 80 ("If you do not comply . . . no coverage will be provided".). In other words, John must have fully complied with the policy's conditions precedent before Essentia's obligation to pay would have become operative.

**B.**

Having established that both the "No Action" and "Duties" Provisions establish conditions precedent, the Court considers whether John's responses to Essentia's demands for relevant information and documents create a genuine dispute of material fact that would suffice for a reasonable finder of fact to conclude that he fully complied with the information requests. *See Anderson*, 477 U.S. at 248.

It is well known that insurers "frequently assert noncompliance with contractual duties as grounds to disclaim liability." *Snyder v. Chester Cty. Mut. Ins. Co.*, 264 F. Supp. 2d 332, 337 (D. Md. 2003). Records-request provisions are understood to be cooperation clauses, *see id.*, as are requirements that insureds submit to examinations under oath. *See, e.g., Phillips v. Allstate Indemn. Co.*, 156 Md. App. 729, 742 (2004).

If cooperation clauses are to serve as conditions precedent, as is the case here, they require "[s]trict compliance" on behalf of the insured in order "to maintain the insurer's payment obligation." *Snyder*, 264 F. Supp. 2d at 337 (citing *Hartford Fire Ins. Co. v. Himelfarb*, 355 Md. 671, 681 (1999)). In contrast to other policy provisions that require only "substantial compliance," any failure by an insured to meet the terms of a condition precedent will vitiate the insurer's liability. *See id.* This consequence, to be sure, is tempered by the general principles that Maryland law "disfavors the forfeiture of coverage," *id.* at 340 (citing *Himelfarb*, 355 Md. at 682), and that insurers are obligated to "investigate claims in good faith." *Id.* at 338 (citing *Port East Transfer, Inc. v. Liberty Mut. Ins. Co.*, 330 Md. 376, 378 (1993)). Further, it bears noting that since 1964, the Maryland General Assembly has required that insurers prove "prejudice by a preponderance of the evidence before disclaiming coverage based on the breach of a liability policy's notice or cooperation clause." *Id.* at 339 (citing Md. Code Ann., Ins. § 19-110).

13

Harking to this latter statutory language, John argues that in order for Essentia to prevail on its defense, it has to show that it has been prejudiced by his noncooperation. *See* ECF No. 110-1 at 12-13.

John's reference to this authority is misplaced. Section 19-110 of the Insurance Code by its terms applies only to "liability policies." Md. Code Ann., Ins. § 19-110; *see Gehani v. Am. Zurich Ins. Co.*, 287 F. Supp. 3d 574, 577 (D. Md. 2017). A "liability insurance policy 'is generally issued for the benefit of third parties who are injured and have a claim against a tortfeasor.'" *Phillips*, 156 Md. App. at 746 (quoting 7 Couch on Insurance § 104:8 (3d ed. 2003)).

Although John did obtain a liability policy from Essentia in connection with this case, *see* ECF No. 118-1 at 2 (Classic Automobile policy), that is not the policy at issue here. What is at issue is the Expert Collector policy on which John bases his breach-of-contract claim, not his liability policy. *See* ECF No. 32 ¶ 3 (identifying the Expert Collector policy, Policy No. 7P75487C, as the contract in dispute). Instead of covering third-party claims, the Expert Collector policy covers only first-party claims by the insured against the insurer for loss or damages to the insured's covered property. *See Phillips*, 156 Md. App. at 747; ECF No. 32 ¶ 10 ("The policy issued to Mr. John by ESSENTIA INSURANCE covers 'direct physical loss to property' which includes the unexpected theft of the vehicles."). In short, Section 19-110 and its concomitant prejudice requirement do not apply to this case. *See Phillips*, 156 Md. App. at 746.[12] Essentia

---

[12] The Court notes that in the *Snyder* decision, one of the Judges of this Court required the insurer to prove prejudice before disclaiming coverage over the insured's claim for burglarized goods under Section 19-111 of the Maryland Code's Insurance Article. *See Snyder*, 264 F. Supp. 2d at 340. However, one year after *Snyder* was decided, the Appellate Court of Maryland (then the Court of Special Appeals) held that an insurer was not required to show prejudice to prevail on its defense of noncooperation against a claim by an insured who sought coverage for his allegedly stolen motorcycle. *See Phillips*, 156 Md. App. at 746-47. The *Phillips* court did not appear to consider the possible applicability of Section 19-111 to the insurer's defense and, in any event, John has not requested this Court to do so. *See* ECF No. 110. The Maryland Appellate Court, not the U.S. District Court for the District of Maryland, is a principal expositor of the meaning of Maryland law, so to the extent that *Snyder* and *Phillips* are in conflict, this Court follows the latest word from the highest state court on the subject. *See Assicurazione Generali, S.p.A. v. Neil*, 160 F.3d 997, 1002 (4th Cir. 1998).

need not demonstrate prejudice in order to prevail on its defense of John's noncooperation with his record-production and examination-under-oath duties.

With this principle in mind, the Court considers whether, on the undisputed facts before it, a reasonable factfinder could conclude that John has complied with his cooperation obligations by producing records to Essentia and by submitting to an examination under oath. *See Anderson*, 477 U.S. at 248.

## C.

John contends that, to the best of his ability, he has fully cooperated by producing all the records material to Essentia's investigation that were in his control and, further, by sitting for multiple examinations under oath. *See* ECF No. 110-1 at 14. He also gestures at, but does not affirmatively allege, that Essentia conducted its investigation in bad faith by asking questions about his finances which, in his view, were "completely irrelevant and immaterial" because, according to John, the only material facts are the "value [of the cars] at the time of policy issuance based on the appraisals," and the theft of the vehicles. *Id.*; *see id.* at 8-9. In any event, says John, the sufficiency of his "cooperation is a question for the jury" and cannot be "decided as a matter of law in these cases." *Id.* at 13-14 (citing *Farmer's Fire Ins. Co. v. Mispelhorn*, 50 Md. 180 (1878); *Mutual Fire Ins. Co. v. Owen*, 148 Md. 259 (1925)).

As a general proposition, the materiality of an insurer's inquiry into an insured's personal finances and the sufficiency of an insured's efforts to respond to such inquiries may well produce genuine disputes of material fact that a factfinder would be charged with deciding after a trial. *See, e.g., Phillips*, 156 Md. App. at 745, *Powell v. United States Fid. & Guar. Co.*, 855 F. Supp. 858, 861 (E.D. Va. 1994). In some circumstances, however, summary disposition will be in order when there exists "no doubt" than an insured has failed to comply with his or her obligations to

15

cooperate with his or her insurer. *Powell*, 855 F. Supp. at 861; *Phillips*, 156 Md. App. at 745; *Gehani*, 287 F. Supp. 3d at 580.

**1.**

Did John meet his record-production obligation? As indicated, Maryland law requires that insurers investigate claims "in good faith." *Snyder*, 264 F. Supp. 2d at 338 (citing *Port East Transfer, Inc.*, 330 Md. at 386). "To request financial documents, an insurer need only believe in good faith that there is possibility of fraud." *Id.* (collecting cases).

Recall that the Duties Provision requires John to "provide [Essentia] with records and documents we request and permit us to make copies." ECF No. 105-2 at 80. Following John's initial recorded statement during which he introduced the possibility, contradicting the assertion in his original application, that the vehicles were owned by Titan BRB, rather than by him, *see* ECF No. 110-5 at ESSENTIA 0259, Essentia asked John to provide various documents necessary to substantiate his claim which would at least tend to rule out any possibility of fraud. *See* ECF No. 105-1 at 22-23; ECF No. 110-1 at 8-10. These requested documents included copies of John's bank statements, his tax returns, and other financial information that might demonstrate John's wherewithal to purchase the vehicles in the first place.

To begin, viewing the facts and drawing all inferences in John's favor, *Rossignol*, 316 F.3d at 523, the Court concludes as a matter of law that Essentia's record requests were made wholly in good faith, especially given that, among other things, the cars were insured for more than half-a-million dollars; that they were reported stolen less than six months after Essentia's insurance policy was issued; that John first indicated that the cars were owned by him and then, after they were stolen, stated they were actually "in the name of" Titan BRB; and that John was unable to provide Essentia with documents ordinarily establishing vehicle ownership such as bills of sale, titles, or registrations. *See Snyder*, 264 F. Supp. 2d at 338.

16

It is undisputed that John did, eventually, produce some documents to Essentia, including personal "bank records and cancelled checks," ECF No. 105-36 at 6; strings of text messages and photographs relating to the purchase of the Porsches between John and Milan, ECF No. 105-32 at 3, ECF No. 110-1 at 8;[13] the records of Titan BRB's Capital One bank account from which the funds to purchase the vehicles were supposedly wired, *see, e.g.*, ECF No. 102-10 at HCCW 0644; unsigned and unfiled tax returns, *see, e.g.*, ECF No. 105-27, 105-10 at 3; a blurry, illegible document he titled "92 bill of sale from George" (presumably the original seller of the 1992 coupe), *see, e.g.*, ECF No. 102-10 at HCCW 0448, ECF No. 110-7 at John RRPD 580-81; and two handwritten "bills of sale" for the vehicles, which suggested that John had purchased the cars from Milan in January and February 2019, *see* ECF No. 110-1 at 9, ECF No. 110-8 at JOHN 629, JOHN 632, JOHN 633.

These items, however, stand in marked contrast to the records that John did *not* produce, *viz.*, his actual tax returns filed under penalties of perjury,[14] the original bills of sale, and records of the vehicles' registration with the Maryland Department of Transportation Motor Vehicles Administration. These, John claims, either do not exist or are outside his possession, so he was unable to produce them. *See* ECF No. 110-1 at 9-10.

---

[13] It bears noting that John produced these phone records only after repeated inquiries from Essentia. The first time Essentia asked for these records, John refused on the ground that they contained "int[ell]ectual property," and that he was "contractually obligated not to disclose those details without [his] partner[']s written consent." He averred that such a request would "violate[]" his rights and would require him to "breach a contract and violate[] the trust between" himself and his partner (presumably Milan). ECF No. 102-10 at HCCW 0644.

[14] John's explanation for failing to produce these tax returns has shifted over time but ultimately landed on the ground that, to date, he has not filed his tax returns for 2019 and 2020, the relevant time period for the purchase and theft of the covered vehicles. *See* ECF No. 110-1 at 9-10; ECF No. 105-12 at 124:05-125:05. "I did not file tax returns for the relevant periods," John in effect says, "but trust me, despite this, everything I say is true." The Court notes that, at least as things stand, John's failure to file the returns would constitute a criminal violation of the federal tax code. *See* 26 U.S.C. § 7203.

Apart from what John has in fact produced, it is indisputable that Essentia had to make multiple requests to get John to supplement his document production over the course of its investigation. *See e.g.*, ECF Nos. 105-10, 105-30 to 105-37.

As shown by its nine-page chronology of its requests and John's responses, Essentia was obliged to make dozens of attempts over the course of five months to get John authorize his accountant to disclose relevant documents. *See* ECF No. 105-10 at 5-14. When John finally consented to Essentia receiving the documents from his accountant, Essentia gave John notice that it would send a courier to pick them up from his accountant's place of business in North Carolina. But when the courier arrived at the accountant's office at the scheduled time, the accountant was not present, and his assistant indicated that the files were not ready to be produced. *See, e.g.*, ECF No. 105-10 at 24; *id.* at 12.

There is yet another example of noncooperation. When Essentia requested the original bills of sale, John initially stated that he believed they were kept in the stolen cars and were thus not in his possession as a result of the theft. ECF No. 110-1 at 8; *see* ECF No. 102-10 at HCCW 0644. When Essentia sought (legible) copies of those bills from the alleged California and Florida sellers, those individuals informed Essentia that they would not do so without written authorization from the person they identified as the buyer---Milan, not John. But when Essentia asked John to have Milan authorize the production of those bills of sale, *see, e.g.*, ECF No. 102-10 at HCCW 0539; ECF No. 105-34 at 4-5, and John presumably did so, Milan never provided that authorization. *See, e.g.*, ECF No. 105-34 at 4-5; ECF No. 110-1 at 9. Milan's refusal to grant such authorization is clearly at odds with John's late-conceived insistence that Milan at all relevant times acted as his agent in the purchase of the vehicles. *See* ECF No. 110-1 at 7-8.

But as a matter of law, if Milan was indeed John's agent in that regard, without question John could have directed Milan to furnish the authorization because, from a legal standpoint, the

18

bills of sale fell within John's "possession, custody, or control." *See* Restatement (Third) Of Agency § 8.12 cmt. d (2006) (an agent is required to "maintain records of dealings on the principal's behalf and provide them to the principal on demand."); *see also Benisek v. Lamone*, 320 F.R.D. 32, 34 (D. Md. 2017) (observing that for purposes of discovery, a party has "control" over a document if it has the "legal right to obtain the documents requested on demand" or otherwise may have the "practical ability" to do so); *Perini America, Inc. v. Paper Converting Machine Co.*, 559 F. Supp. 552, 553 (E.D. Wis. 1983) (holding that for purposes of discovery, production of documents held by an agent could be compelled because those documents were in the control of the principal).

In sum, John's halting, piecemeal document production has amounted to little more than what one Judge of this Court has described as an insured's "meager, belated efforts" to "furnish[] the insurer with information reasonably requested by the insurer," which as a matter of law the Court deems insufficient to satisfy an insurance policy's cooperation provisions. *Gehani*, 287 F. Supp. 3d at 580; *see also 50 Waterville St. Tr., LLC v. Vt. Mut. Ins. Co.*, 647 F. Supp. 3d 62, 75 (D. Conn. 2022) (similar).[15] Here, the record conclusively shows that there is no genuine dispute of material fact as to whether John strictly complied with his obligation to furnish records to Essentia during its investigation. *See Snyder*, 264 F. Supp. 2d at 337. Quite simply, he did not.

## 2.

The Court also considers whether John satisfactorily complied with his obligation to cooperate with Essentia when responding to its questions during John's examinations under oath. An insurer is "entitled to conduct a searching examination" under oath of an insured making a

---

[15] The *Gehani* case assumed that the more lenient "substantial compliance" standard applied and even then found the insured's production efforts lacking. *See* 287 F. Supp. 3d at 578 n.4. The Court has already determined that John's Expert Collector policy contains conditions precedents, so even if John's efforts could be said to have "substantially complied" with his obligations—a doubtful proposition on this record—Essentia would be entitled to judgment. *See Woznicki*, 443 Md. at 127.

claim, so long as "all questions [are] confined to matters relevant and material to the loss." *Phillips*, 156 Md. App. at 743. "An insured is not required to answer immaterial questions." *Id.* (citation omitted). "In a theft case, the insurer may ask questions relating to possible motives for fraud, such as prior loss or claim history, and financial circumstances of the insureds." *Id.* (citation omitted).

In *Phillips*, the Appellate Court of Maryland was faced with the question of whether an insured had satisfactorily complied with his obligation to provide testimony during his examination under oath. *See* 156 Md. App. at 744-45. The insured had purchased a motorcycle and obtained an insurance policy to cover its damage or loss. *See id.* at 733-37. A mere ten days after the motorcycle was purchased, the insured filed a claim asserting that the motorcycle had been stolen. *See id.* During his initial recorded statement, the insured "lied about his employment and how he acquired the money to purchase the motorcycle." *Id.* at 745. The Appellate Court found this sufficient to put the matter of his finances in play because the insurer could have reasonably suspected that the insured's claim was fraudulent. *See id.* The insured later recanted his misrepresentations about his employment but continued to refuse to answer any questions about his financial condition. *Id.* Those questions, in the view of the *Phillips* court, were as a matter of law "relevant and material." *Id.* In consequence, the court affirmed the trial court's grant of summary judgment to the insurer because the insured's misrepresentations raised the possibility of fraud and the insured's "refusal to answer questions about his financial circumstances . . . constituted a failure to cooperate." *Id.* at 747-48.

Similarly, in *Powell*, the U.S. District Court for the Eastern District of Virginia held that where the insureds invoked the Fifth Amendment privilege against self-incrimination in response to questions about their financial conditions, they failed, as a matter of law, to satisfactorily comply with their policy's cooperation provision. *See* 855 F. Supp. at 860-62. The court stated

that "[w]hile the plaintiffs in this case did not refuse to answer every question about their finances, they did refuse, on the basis of materiality, to provide a substantial amount of requested information which related to their financial condition at the time of the [loss] and was relevant to this case." *Id.* at 861. The Virginia court granted summary judgment to the insurer because there was "no doubt that the plaintiffs failed to cooperate as required by the policy." *Id.*[16]

When viewed at 30,000 feet, so to speak, John's efforts to comply with Essentia's questions may be deemed more extensive than those of the insureds in *Phillips* and *Powell* because he sat for numerous examinations and did not refuse outright to answer questions. But a review of the record as a whole demonstrates that John's conduct, in a practical sense, still left Essentia in the same place as the insurers in both *Phillips* and *Powell*—which is to say, entirely frustrated by the insured's obstruction and evasiveness.

Essentia initiated and reconvened John's examination under oath a total of seven times, during which he provided more than twenty hours of testimony over the course of seventeen months. *See, e.g.*, ECF No. 110-1 at 11-12. But during that testimony, John repeatedly disputed whether his financial status was relevant to Essentia's investigation, ECF No. 105-11 at 158:12-159:22; repeatedly failed to identify all his business holdings and their tax identification numbers, *id.* at 132:23-134:08; repeatedly questioned the overall good faith of Essentia's investigators, *see, e.g.*, *id.* at 157:10-14; and repeatedly engaged in ad-hominem attacks on Essentia's investigators, *id.* at 292:02-13.

At the end of the day, it cannot be fairly disputed that John was either unwilling or unable to provide Essentia the information that it reasonably requested and to which it was entitled so as

---

[16] The insurance policy in *Powell* was governed by Virginia law, but any possible distinction between that case and the case at bar is inconsequential. It is well established, including under the law of Maryland, that invocation of the privilege against self-incrimination in response to an insurer's questions about the insured's financial condition can constitute noncooperation when there are reasonable grounds to suspect that the insured has submitted a fraudulent claim. *See, e.g.*, *Phillips*, 156 Md. App. at 747-48.

to allay its concerns about the bona fides of his claim. Viewing the record in the light most favorable to John, drawing all reasonable inferences in his favor, the undisputed facts demonstrating John's obstinance are overwhelming. It would defy reason and the record for the Court to rule that a reasonable factfinder could conclude that John strictly complied with his obligation to cooperate with Essentia during his examinations under oath. *Snyder*, 264 F. Supp. 2d at 337.

### D.

John's conduct poses the issue of whether an insured can defeat summary judgment on the grounds of noncooperation, even if he has furnished some (but not all) records to the insurer, and even if he has given inconsistent, self-contradictory, and incomplete responses during his examination under oath. John asks the Court to rule, as a matter of law, that so long as the insured has produced *some* records or has said *something* in support of his claim for coverage, even if his explanations change over time, his case should be put before a jury. The Court firmly believes it should not.

John has not identified a single authority from Maryland or elsewhere in support of his position, and for good reason. "While the evidence of the non-movant is to be believed and all *justifiable* [i.e., reasonable] inferences drawn in its favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001) (emphasis added). Moreover, a mere "scintilla" of evidence in support of a nonmoving party's case will not suffice to defeat summary judgment. *Anderson*, 477 U.S. at 251-52.

As a condition precedent, John was obliged to strictly comply with the terms of his policy with Essentia in terms of document production and truthful, consistent answers under oath. The

undisputed material facts establish emphatically that he failed to do either. Essentia is entitled to judgment as a matter of law.

Accordingly, the Court will **GRANT** Essentia's Motion for Summary Judgment.

### III.

Having concluded that Essentia is entitled to judgment as a matter of law because John failed to meet the conditions precedent that he cooperate with Essentia's investigation, the Court need not determine whether, independently of that, Essentia is also entitled to judgment on its defense that John misrepresented material facts.

In view of the Court's grant of Essentia's Motion for Summary Judgment, the Court will **DENY AS MOOT** John's Motion for Partial Summary Judgment.

### Conclusion

In conclusion, the Court will **ORDER** that:

1. Essentia's Motion for Summary Judgment (ECF No. 105) is **GRANTED**;

2. John's Motion for Partial Summary Judgment (ECF No. 102) is **DENIED AS MOOT**;

3. Final judgment is **ENTERED** in favor of Essentia and against John on Count I of his Second Amended Complaint; and

4. The Clerk of Court is directed to **CLOSE** this case.

A separate Order will issue.

June _13_, 2024

_____
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

23